369 S.E.2d 22

**STATE of West Virginia**

v.

**Robert Eugene AYERS.**

**No. 17433.**

Supreme Court of Appeals of
West Virginia.

April 1, 1988.

John D. Wooton, Wooton, Wooton & Fragile, Beckley, for Robert Eugene Ayers.

Mary Rich Maloy, Atty. Gen. Office, Charleston, for State.

PER CURIAM:

This case is before the Court upon the appeal of Robert Eugene Ayers from his conviction of three counts of first degree sexual assault and three counts of incest. It arises from an order of the Circuit Court of Raleigh County which denied the appellant's motion for a new trial. The appellant has been ordered to serve fifteen to twenty-five years for three first degree sexual assault convictions and five to ten years for three incest convictions. The sentences are to run concurrently. The appellant contends that his conviction should be reversed because (1) the trial judge erred when he denied the accused's motion for a psychiatric evaluation to determine the competency of the seven-year-old prosecutrix; (2) the trial judge erred when he denied the accused's motion for a mistrial; (3) the trial judge erred when he failed to set aside the jury verdict as the evidence was insufficient to sustain the convictions. We disagree and affirm.

This case surrounds the credibility of a seven-year-old prosecutrix, who testified she was sexually assaulted by her stepfather on three occasions within a two-day period of time. There is essentially no medical evidence, psychiatric or gynecological.

On Saturday, August 18, 1984, six-year-old H. was playing with her eight-year-old

cousin, M., outside the Ayers' home. She began crying and stated that her stepfather, the defendant, sexually assaulted her. Later that afternoon, M. cried and repeated H.'s disclosure to his mother, Vicki Guilliams, the defendant's sister-in-law.

Mrs. Guilliams returned to the Ayers' home, removed H., and contacted her family physician, general practitioner, Dr. Teodoro Jiminez, who recommended that she bring H. to his office on Monday. Dr. Jiminez visually examined H. on Monday, August 20, 1984 and found no bruising or bleeding. The doctor chose not to perform a pelvic examination due to the child's age.

During his examination of H., Dr. Jiminez recorded her history. H. stated that her stepfather attempted intercourse with her on seven occasions. She graphically detailed her stepfather's actions and stated that penetration had occurred on three occasions during the prior week.

Dr. Jiminez recommended that Mrs. Guilliams report the incidents to the police and social services personnel. That evening, August 20, 1984, Mrs. Guilliams informed her sister, H.'s mother, of H.'s allegations. H.'s mother, who testified as a witness for the defendant, spent the night at Mrs. Guilliams' home. H. again detailed the incidents to her mother.

The following day, August 21, 1984, Mrs. Guilliams and H. went to the police and gave statements which lead to the indictment of the defendant. That evening, H. and her mother left Mrs. Guilliams' home and spent the evening alone. The mother testified that H. accused a third party, rather than her stepfather. H. was not questioned about this incident by either party.

A few days after the defendant's arrest, H. was left in the care of the defendant's sister, who also testified that H. accused the third party, rather than her stepfather. H. was not questioned about this incident by either party. Later that day, the defendant's sister took H. to the home of the defendant's parents. Several of the defendant's relatives and friends were present. During that time, H. stated that her stepfather did not assault her, but that the third

party had assaulted her. The defendant's relatives testified that H. gratuitously offered the information to them. H. testified that she was questioned by her relatives about the incidents, then telephoned her mother in their presence, and stated that the third party, rather than her stepfather, was her assailant.

H. was hospitalized from August 29, 1984 through September 10, 1984 for an adjustment disorder which was precipitated by a court-ordered removal of H. from the parental home. H.'s treating psychiatrist was Dr. McCallum. (While Dr. McCallum was never subpoenaed by either party, his records, though not placed into evidence, were used extensively in an *in camera* hearing concerning H.'s competency.)

Dr. McCallum noted that Mrs. Guilliams was "over-enmeshed," and recommended that she and her husband "avoid projecting their own angry and resentful feelings" to H. He further discouraged them from "over editorializ[ing] the sexual issue." However, he later commented that Mrs. Guilliams "approach to [H.] had improved."

Dr. McCallum noted that H. was "well oriented," of average intelligence, and was able to detail her sexual relationship with her stepfather. However, he noted that H. was "hypermature" and referred to herself as a "sexual abuse victim." His final prognosis was: "At the time of discharge she appeared to be fairly well adjusted, did not demonstrate significant evidence of depression or agitation." Two-week follow-up visits were recommended. H. has been treated regularly by a therapist.

During her stay in the hospital H. was visited by a teenage member of a church group which visits hospitalized persons. The teenager knew the Ayers family and was aware of the charges pending against the defendant. The teenager testified that H. once again stated that her stepfather did not assault her. Again, H. was not questioned about this incident by either party.

The defendant's theory of the case was that the aunt, Mrs. Guilliams, wanted the child, hated the child's stepfather, and

therefore manipulated the child's testimony. (H. was alone with Mrs. Guilliams from August 18, 1984 until August 20, 1984. She was then under the care of her mother from August 20, 1984, until August 29, 1984. She returned to the Guilliams' home from September, 1984 until the trial in May, 1985). H. and her mother lived with Mrs. Guilliams for over a year prior to the mother's marriage to the defendant. The prosecutrix admitted at trial that she frequently played "practice court" with her aunt and reviewed her testimony with the assistant prosecutor. However, she testified under oath that her stepfather engaged in sexual intercourse with her on three occasions in August, 1984. Her stepfather testified that these events never occurred.

## I

As his first assignment of error, the defendant, relying on *Burdette v. Lobban,* 174 W.Va. 120, 323 S.E.2d 601 (1984), alleges that the trial court improperly denied his pretrial motion for an independent psychiatric evaluation of the prosecutrix's competency.

This motion was briefed by the State, defense counsel, and the child's *guardian ad litem.*

The defendant, relying exclusively on *Burdette v. Lobban,* 174 W.Va. 120, 323 S.E.2d 601 (1984) and Dr. McCallum's report, argued that the aunt's influence on the child raised a question of the child's competency. Therefore, an additional psychiatric evaluation was necessary.

In *Burdette,* the *guardian ad litem* of an infant in an abuse and neglect proceeding, under *W.Va.Code,* 49-6-1, *et seq.* [1977], sought a writ of prohibition against a circuit judge who ordered that the infant could be interviewed by her father's counsel without the presence of her *guardian ad litem.* After ruling that the child was statutorily entitled to the presence of counsel, this Court also stated:

Often a child in an abuse proceeding is the only potential witness. Thus, the problem confronting any court at the outset of an abuse proceeding is whether the child is competent to testify against her parents. When dealing with adult witnesses, the issues of competency and credibility are separable. These distinctions become blurred in the case of a five-year-old, however. In some situations a child may be engaging in phantasy. For example, the child may desire to 'hurt' the parent for a real or imagined grievance. In other cases, the child may be incapable of making rational judgments on his own without being unduly influenced by others. *See,* Note, 'Lawyering for the Abused Child: You Can't Go Home Again' 29 UCLA L.Rev. 1216, at 1241-44 (1982).

Therefore, we understand a trial court's concern to determine that a child is a competent witness before she is allowed to be the prime accuser. To do this the court *should* appoint a neutral child psychologist or psychiatrist to inquire into the child's capacity.

(emphasis added). *Burdette v. Lobban,* 174 W.Va. 120, 122, 323 S.E.2d 601, 603 (1984).[1]

The trial court ruled that based on the evidence available at that time, the facts did not merit an additional psychiatric evaluation; however, if "substantial reasons" were presented for the evaluation, the court would reconsider the motion.

Prior to trial, the motion was renewed and an *in camera* hearing was conducted. One witness was called, defendant's expert, Mr. Jim Rubin, M.A., social work. Mr. Rubin restated Dr. McCallum's notations concerning the child's "hypermaturity," and the aunt being "overenmeshed" and "editorializing."

---

1. Statutory authority for psychiatric evaluations in abuse and neglect proceedings is contained, in pertinent part, in *W.Va.Code,* 49-6-4(a) [1984]:

   (a) At any time during proceedings under this article the court may, upon its own motion or upon motion of the child or other parties, order the child or other parties to be examined by a physician, psychologist or psychiatrist, and may require testimony from such expert, subject to cross-examination and the rules of evidence.

Defense counsel asked Mr. Rubin if he believed Dr. McCallum's report created "at least some question" of undue influence so as to prompt an independent psychiatric evaluation of the child's competency. He responded: "[I]t would be no loss to the Court to have a second opinion to ascertain whether this child has been coached or her testimony might be valid. I see no loss whatsoever that this would not and could not be done."

Neither the State nor the defendant subpoenaed Dr. McCallum, although he appeared on the defendant's witness list. The trial judge ruled that H. was competent to testify, without resorting to an additional psychiatric evaluation.[2]

■ As noted in *Burdette* the competency of infants may be challenged on two different levels. The first, more traditional, challenge concerns the child's ability to perceive the distinction between truth and falsity as well as the consequences of falsely testifying under oath. Syl. pt. 1, *State v. Jones*, 178 W.Va. 519, 362 S.E.2d 330 (1987); *Burdette v. Lobban*, 174 W.Va.

120, 122, 323 S.E.2d 601, 602, 603, note 1 (1984); *State v. Watson*, 173 W.Va. 553, 318 S.E.2d 603 (1984). The second challenge, approved in *Burdette*, concerns whether the child, due to various psychological factors, is so inherently incredible as to require an additional psychiatric evaluation to determine whether the child may testify. As noted in *Burdette*, the decision to require an additional psychiatric evaluation prior to determining competency is within the trial judge's discretion. *Burdette v. Lobban*, 173 W.Va. 553, 323 S.E.2d 601, 602 (1984).[3]

■ The trial judge did not abuse his discretion, since he could properly find, based upon Mr. Rubin's opinion, standing alone, that an additional psychiatric evaluation to determine whether the child was so inherently incredible as to render her incompetent was not merited.[4] In syllabus point 6 of *State v. Humphrey*, 177 W.Va. 264, 351 S.E.2d 613 (1986), this Court held that normally credibility is a jury consideration. However, there may be circumstances where a witness is so inherently incredible that a trial court may properly

**2.** When H. testified before the jury, she was extensively *voir dired* by the assistant prosecuting attorney concerning her understanding of the distinction between truth and falsity as well as the consequences of falsely testifying under oath. Her responses indicated total competency.

**3.** The ability to challenge competency on either of these two grounds has been criticized. The common law test of competency (knowledge of the distinction between truth and falsity) has been questioned in light of *W.Va.R.Evid.* 601: "Every person is competent to be a witness except as otherwise provided for by statute." *See* F. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 2.2(C) (1988 Supp.). Further, the *Burdette* challenge to competency has also been questioned in light of West Virginia's rape shield statute, *W.Va.Code*, 61–8B–11(c) [1984], which states: "In any prosecution under this article, neither age nor mental capacity of the victim shall preclude the victim from testifying." *See* Cleckley, *supra*, § 2.2(B).

**4.** In arguing that the trial judge erroneously denied the additional psychiatric evaluation, the defendant has not alleged that his Sixth Amendment right to confront his accuser was violated, but merely that the trial judge committed reversible error. While West Virginia has never addressed the issue, the vast majority of juris-

dictions which have addressed it, find that such an examination is not constitutionally required. Annot., 45 A.L.R.4th 310 (1986). *Cf. State v. Allman*, 177 W.Va. 365, 368, 352 S.E.2d 116, 119 (1986) (A criminal defendant is entitled to require disclosure of psychiatric records of a material witness, pursuant to *W.Va.Code*, 27–3–1(b) [1986], in order to establish that a psychiatric disorder has effected a witness' credibility); *W.Va.Code*, 49–6A–7 [1977]; *Pennsylvania v. Ritchie*, 480 U.S. 989, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987) (A criminal defendant who establishes a basis for minor, sexual assault prosecutrix's psychiatric records is entitled to *in camera* review and receipt of exculpatory evidence to meet due process considerations. The majority specifically rejected a confrontation clause analysis). The defendant did not subpoena Dr. McCallum, Dr. Hassan (both of whom appeared on his witness list), or H.'s current treating therapist.

Counsel has not raised, nor do we have sufficient facts before us, to determine whether the motion was so inadequately documented as to rise to the level of ineffective assistance of counsel. *See In the Matter of Leonard M.*, 85 Cal. App.3d 887, 149 Cal.Rptr. 791 (1978), *vacated on other grounds*, 443 U.S. 914, 99 S.Ct. 3105, 61 L.Ed.2d 878 (1979); *People v. Lewis*, 55 Ill. App.3d 1022, 13 Ill.Dec. 737, 371 N.E.2d 672 (1977); *McClain v. State*, 560 S.W.2d 894 (Mo. App.1978); *Commonwealth v. Stoner*, 284 Pa.Super. 364, 425 A.2d 1145 (1981).

exclude the testimony. *State v. Humphrey*, 177 W.Va. 264, 271, 351 S.E.2d 613, 619. However, this decision is discretionary:

‘ "The question of the competency of a witness to testify is left largely to the discretion of the trial court and its judgment will not be disturbed unless shown to have been plainly abused resulting in manifest error." Point 8, Syllabus, *State v. Wilson*, 157 W.Va. 1036, 207 S.E.2d 174 (1974).' Syllabus Point 3, *State v. Butcher*, 165 W.Va. 522, 270 S.E.2d 156 (1980).

Syl. pt. 7, *State v. Humphrey, supra.*

## II

The second assignment of error concerns the appellant's motion for mistrial, or in the alternative, motion to strike. The following exchange took place during direct examination of the child prosecutrix:

Q  Where did he have sex with you? What place were you right before you told Vicki—the days before you told Vicki?

A  At the graveyard at the dirt road down at Sissy's house and his mom and dad's.

The appellant was indicted on three counts of sexual assault, one occurring at the graveyard, one on the dirt road and one at the stepfather's parent's home. Therefore, when the child mentioned "Sissy's house," the jury could also conclude that a fourth incident occurred.

The defendant moved for a mistrial, or in the alternative, to strike the prosecutrix's answer. The court denied the mistrial motion and granted the motion to strike. In doing so the court gave the following curative instruction:

Ladies and gentlemen of the jury, in this witness' testimony that you've already heard, she made some reference to sex occurring at Sissy's house; that the Court will tell you is not proper evidence, and you should not consider it in no way whatever. That's a ruling of law, and I'm making it now. It only deals with that part of her testimony as to sex occurring at Sissy's house, and none—

the rest of it is in the case for your consideration.

The determination that a "manifest necessity" exists to merit a mistrial is within the sound discretion of the trial judge. *W.Va.Code*, 62–3–7 [1923]; *State v. Williams*, 172 W.Va. 295, 305 S.E.2d 251 (1983); *Betts v. Scott*, 165 W.Va. 173, 267 S.E.2d 173, 179 (1980); *State ex rel. Dandy v. Thompson*, 148 W.Va. 263, 134 S.E.2d 730 (1964), *cert. denied*, 379 U.S. 819, 85 S.Ct. 39, 13 L.Ed.2d 30 (1964). Since the prosecutrix's reference to a possible fourth incident of sexual assault was vague, and not pursued by the State in any subsequent question, the trial judge did not abuse his discretion in denying the motion for mistrial. *State v. Compton*, 167 W.Va. 16, 277 S.E.2d 724 (1981).

Further, the trial court gave a curative instruction. " 'Ordinarily where objections to questions or evidence by a party are sustained by the trial court during the trial and the jury instructed not to consider such matter, it will not constitute reversible error.' Syl. pt. 18, *State v. Hamric*, 151 W.Va. 1, 151 S.E.2d 252 (1966)." Syl. pt. 3, *State v. Lusk*, 177 W.Va. 517, 354 S.E.2d 613 (1987).

Since the trial judge did not abuse his discretion in denying the motion for mistrial and gave a curative instruction, no reversible error occurred.

## III

The accused's third assignment of error is that there was insufficient evidence to sustain his convictions for incest and sexual assault. Specifically, the accused contends that the prosecutrix's testimony was unreliable due to the undue influence of the aunt, and no medical evidence corroborates her story.

In a criminal case, a verdict of guilt will not be set aside on the ground that it is contrary to the evidence, where the state's evidence is sufficient to convince impartial minds of the guilt of the accused beyond a reasonable doubt, though the evidence adduced by the accused is in conflict therewith. To warrant interfer-

ence with a verdict of guilt on the ground of insufficiency of evidence, the court must be convinced that the evidence was manifestly inadequate, and that consequent injustice has been done. Syl. pt. 1, *State v. Starkey,* 161 W.Va. 517, 244 S.E.2d 219 (1978).

The prosecutrix testified that on three occasions the accused, her stepfather, engaged in sexual intercourse with her. She admitted at trial that she had later recanted the allegations when the stepfather's relatives began questioning her of the charge. She testified that at six years old, she felt pressured to recant the statement, and blamed a third person for the incidents. She also admitted to extensive practicing of testimony with her aunt and the prosecutor. While there was no corroborating medical evidence, Dr. Jiminez recorded H.'s graphic descriptions of the three instances of sexual assault on the 20th of August. H. would have been alone with her aunt for only two evenings prior to making such statements. H. testified that she loved her mother and wished to live with her, as evinced by her severe reaction to the court order removing her from the marital home. While H.'s mother testified for the defendant, she was impeached on several occasions with prior inconsistent statements.

The jury was provided with the following amended instruction, offered by the accused:

> [I]f you believe from the evidence in this case that the testimony of [H.], age 6, is uncorroborated, then in that case, you should scrutinize the same with great care and caution. The court further instructs the jury that if you believe her testimony to be not believable, then you should disregard her testimony and find the defendant, Eugene Ayers, not guilty.

This instruction was based on *State v. Perry,* 41 W.Va. 641, 24 S.E.2d 634 (1896), discussed in syl. pt. 5, *State v. Payne,* 167 W.Va. 252, 280 S.E.2d 72 (1981).

"A conviction for rape may be had on the uncorroborated testimony of the female, and unless her testimony is inherently incredible her credibility is a question for the jury." Syl. pt. 4, *State v. Green,* 163 W.Va. 681, 260 S.E.2d 257 (1979).

In essence, the jury was faced with the decision that the young prosecutrix was either pressured to lie by her maternal aunt or pressured to lie by her mother and stepfather's relatives. The jury deliberated for slightly over an hour and convicted the accused. "Whether the witnesses are to be believed or disbelieved is a matter for jury consideration. An appellate court can not invade the province of the jury concerning the weight of the evidence, where such evidence is not incredible; nor can it judge the credibility of witnesses." *State v. Bailey,* 151 W.Va. 796, 806, 155 S.E.2d 850, 856 (1967). Since the jury was given an instruction to scrutinize the prosecutrix's testimony, if they found it uncorroborated, the prosecutrix's credibility was a jury consideration, which will not be overturned.

Based on all the foregoing, we affirm the conviction.

Affirmed.