# STATE OF WEST VIRGINIA
# SUPREME COURT OF APPEALS

**M. Salim Ratnani,**
**Plaintiff Below, Petitioner**

**FILED**

**November 22, 2013**
**RORY L. PERRY II, CLERK**
**SUPREME COURT OF APPEALS**
**OF WEST VIRGINIA**

**vs) No. 12-1471** (Kanawha County 07-C-1258)

**Thoracic and Cardiovascular Associates, Inc.,**
**a West Virginia business corporation,**
**Defendant Below, Respondent**

## MEMORANDUM DECISION

Petitioner M. Salim Ratnani, by counsel Kenneth E. Webb, Jr., Justin M. Harrison, and Patrick C. Timony, appeals the order of the Circuit Court of Kanawha County, entered November 21, 2011, denying his renewed motion for judgment as a matter of law or, in the alternative, motion for a new trial. Respondent Thoracic and Cardiovascular Associates, Inc. appears by counsel Mychal S. Schulz and Ashley C. Pack.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision is appropriate under Rule 21 of the Rules of Appellate Procedure.

I.

Respondent is a physicians' practice incorporated in 1977 by Dr. Jamal Khan and Dr. Zafrullah Khan. On October 27, 1991, respondent's physicians engaged in a meeting, wherein the meeting minutes reflect that "[i]t was decided that a departing partner will be paid termination benefits according to his accounts receivable." This meeting resulted in the execution of identical contracts for the six physicians then associated with the practice, with each contract containing the following provision[1]:

---

[1]At the time the October 27, 1991, meeting occurred, only three of the physicians associated with the practice were shareholders. Shareholder privileges were extended to the remaining three associated doctors in March of 1992. Dr. Jamal Khan testified that the term "partner" in the minutes was used interchangeably with the term "physician" because three associated physicians were not yet shareholders. The six physicians ultimately receiving the termination benefit provision were: Dr. Jamal Khan, Dr. Zafrullah Khan, Dr. Humayun Rashid, Dr. Antonio Cafoncelli, Dr. Kee Lee, and Dr. Firasat Malik.

1

Benefit on Termination of Employment

> (a) In the event of Employee's death or termination of employment pursuant to paragraph 14 during the term of this Agreement, this Agreement shall terminate immediately and Corporation shall pay to the Employee or, in the case of death, to the beneficiaries of Employee designated in writing by Employee or, in the absence of such designation, to the estate of Employee an amount which is equal to a percentage of Employee's personal accounts receivable based on collection percentages of previous six (6) months for the departing Employee, less 10% for administrative expenses.

Petitioner later was recruited by respondent, and the parties entered into an employment agreement in April of 1996. Pursuant to his contract, petitioner was eligible for shareholder status after completing a five-year probationary period, depending on the approval of respondent's shareholders. Dr. Jamal Khan testified that while recruiting petitioner, he represented that petitioner could achieve "equal shareholder" status; however, petitioner's employment contract did not contain the "benefit on termination of employment" provision that the predecessor shareholders' contracts contained. Dr. Khan explained in his trial testimony why the provision was not included in petitioner's contract, or in the contract of any physician to associate with respondent after the first six shareholders:

> Q: Doctor, why did the group decide, those six who were meeting at this doctors' meeting, why did those six decide that those six ought to have that termination benefit?

> A: Because they had been working for several years and had been pretty much the people who had grown the practice, and the original contracts mentioned that and we had to retain it.

He further explained:

> A: When those six discussed this and saw the necessity to add more doctors, we did not know how far we would go, and the original six had these terms already, so they were incorporated in their contracts, but we felt that if the group gets bigger, you get 8, 9, or 10 surgeons, the chances of the group becoming unstable and two or three or four of them getting together and splitting from the group and wanting to practice by themselves, would put a drain on the resources of the . . . associates if we give all of them their accounts receivable.

Petitioner became a shareholder of respondent corporation in April of 2001. Respondent terminated petitioner's employment in October of 2006, and petitioner then requested payment of an accounts receivable benefit on termination. His request was denied. Petitioner instituted this action seeking such payment in the Circuit Court of Kanawha County on June 22, 2007.

At the conclusion of a jury trial, the jury returned a verdict in favor of respondent. The

2

circuit court entered its judgment order on June 9, 2011, and petitioner filed a renewed motion for judgment as a matter of law or, in the alternative, motion for a new trial, which the court denied. On appeal, petitioner asserts that the circuit court committed four reversible errors throughout the pendency of the action. First, he argues that the court abused its discretion in failing to grant him judgment as a matter of law on his claim of promissory estoppel. Second, he argues that the circuit court abused its discretion in refusing his proposed jury instruction and special interrogatory on an alternative breach of contract theory. Third, he argues that the circuit court denied his right to cure the presentation of inadmissible evidence by respondent. Finally, he argues that the circuit court erred by failing to grant his motion for a mistrial after respondent violated the court's earlier ruling on respondent's motion *in limine* to exclude evidence of the reasons for petitioner's employment termination.[2]

II.

Petitioner's first assignment of error is that the circuit court abused its discretion when it denied his motion for judgment as a matter of law, which he made at the close of his case and renewed post-trial, on his promissory estoppel claim.

> [T]he standard for reviewing the circuit court's rulings on pre-verdict and post-verdict motions for judgment as a matter of law is identical. *See Barefoot v. Sundale Nursing Home*, 193 W.Va. 475, 481-82 n. 6, 457 S.E.2d 152, 158-59 n. 6 (1995)("The standard for granting a judgment notwithstanding the verdict is the same as for a directed verdict.") We apply a *de novo* standard of review to the grant or denial of a pre-verdict or post-verdict motion for judgment as a matter of law. After considering the evidence in the light most favorable to the nonmovant party, we will sustain the granting or denial of a pre-verdict or post-verdict motion for judgment as a matter of law when only one reasonable conclusion as to the verdict can be reached. *See* Syl. pt. 3, *Brannon v. Riffle*, 197 W.Va. 97, 475 S.E.2d 97 (1996).

*Gillingham v. Stephenson*, 209 W.Va. 741, 745, 551 S.E.2d 663, 667 (2001). We also have explained:

> A motion for a judgment notwithstanding the verdict provides the court with an opportunity, after the jury has been discharged, to reconsider its previous refusal to grant a motion for a directed verdict made at the close of all the evidence. West Virginia Rules of Civil Procedure, 50(b). The same factors as to the sufficiency of evidence for a directed verdict apply when ruling on a motion for a judgment notwithstanding the verdict. M. Lugar and L. Silverstein, *West Virginia Rules*

---

[2]Additionally, respondent presents its own cross-assignment of error pursuant to Rule 10(f) of our Rules of Appellate Procedure. It argues that the circuit court erred in not permitting it to call at trial a witness that it had failed to timely disclose. Inasmuch as we have found no merit in petitioner's assignments of error as set forth in the body of this decision, we decline to address respondent's cross-assignment of error.

379, 380 (1960). Accordingly in cases where the evidence is such that the jury could have properly found for either party upon the factual issues in the case, a motion for a judgment notwithstanding the verdict should not be granted. *See, Alexander v. Jennings*, 150 W.Va. 629, 149 S.E.2d 213 (1966).

*Morgan v. Bottome*, 170 W.Va. 23, 24, 289 S.E.2d 469, 470 (1982).

Under the umbrella of this standard, we must consider the evidence presented to determine whether the only reasonable conclusion is that petitioner was entitled to relief by operation of promissory estoppel. We have written:

This Court set out the principles governing the doctrine of promissory estoppel in *Everett v. Brown*, 174 W.Va. 35, 321 S.E.2d 685 (1984), as follows:

A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce the action or forbearance is enforceable notwithstanding the Statute of Frauds if injustice can be avoided only by enforcement of the promise. The remedy granted for breach is to be limited as justice requires.

In determining whether injustice can be avoided only by enforcement of the promise, the following circumstances are significant: (a) the availability and adequacy of other remedies, particularly cancellation and restitution; (b) the definite and substantial character of the action or forbearance in relation to the remedy sought; (c) the extent to which the action or forbearance corroborates evidence of the making and terms of the promise, or the making and terms are otherwise established by clear and convincing evidence; (d) the reasonableness of the action or forbearance; (e) the extent to which the action or forbearance was foreseeable by the promisor.

Syl. pt. 3, *Everett*, *id.*

*Hoover v. Moran*, 222 W.Va. 112, 119-20, 662 S.E.2d 711, 718-19 (2008).

Petitioner does not argue that he was specifically promised a particular distribution benefit upon separation of employment. Rather, he argues that Dr. Khan's declaration that he would have the opportunity to become an "equal shareholder" conveyed the assurance that his terms of employment would be identical to those of the other shareholders. We disagree that this is the only reasonable conclusion.

At trial, Dr. Khan verified the content of the written offer of employment extended to petitioner:

4

. . . Your starting salary will be $150,000 for the first year and $200,000 for the second year. Thereafter, your salary will be determined according to the same formula applied to the current partners. In addition, you will receive a monthly car allowance same as other partners. Other benefits include malpractice insurance, health insurance, disability insurance, and a small term life insurance. You will be eligible to participate in group retirement after completing one year of service.

You will be allowed three weeks, or fifteen working days, of vacation in the first year; four weeks, or twenty working days, second year. After that, it will be the same as for other partners. In addition, one week per year may be allowed for attending relevant meetings, courses, etc.

At the end of five years and with continued satisfactory association from both sides, *you will be offered an opportunity to become an equal shareholder in the practice by buying corporation stock.*

Although it is not part of the contract, we will include you in any bonus distributions to the physicians, depending on your performance and productivity. . . .

(Emphasis supplied.)

The offer of equal shareholder status appears on its face limited to ownership of the corporation, and not to equality of contract terms. Moreover, petitioner testified that he was not privy to the contracts of the other physicians prior to accepting the offer of employment. Thus, there is no evidence that he was induced to accept employment based on any term other than those set forth in the written offer as shown above. We need not evaluate the factors for determining whether injustice can be avoided only by enforcement of a promise, because there is no evidence that any promise actually made to petitioner was not kept. The jury verdict was supportable, and the motion for judgment as a matter of law was properly denied.

III.

Petitioner's second assignment of error is that the circuit court erred in refusing his proffered jury instruction and related special interrogatory. In *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995), we discussed the basic requirements for jury instructions. Syllabus Point 4 of *Guthrie* states:

A trial court's instructions to the jury must be a correct statement of the law and supported by the evidence. Jury instructions are reviewed by determining whether the charge, reviewed as a whole, sufficiently instructed the jury so they understood the issues involved and were not mislead by the law. A jury instruction cannot be dissected on appeal; instead, the entire instruction is looked at when determining its accuracy. A trial court, therefore, has broad discretion in formulating its charge to the jury, so long as the charge accurately reflects the law. Deference is given to a trial court's discretion concerning the specific

5

wording of the instruction, and the precise extent and character of any specific instruction will be reviewed only for an abuse of discretion.

Likewise, the submission of special interrogatories to the jury is within the circuit court's discretion. *See* Rule 49(b) of the West Virginia Rules of Civil Procedure ("[t]he court may submit to the jury . . . written interrogatories"). We have held that, "[a]s a general rule, a trial court has considerable discretion in determining whether to give special verdicts and interrogatories to a jury unless it is mandated to do so by statute." Syl. Pt. 8, *Barefoot v. Sundale Nursing Home*, 193 W.Va. 475, 457 S.E.2d 152 (1995). Furthermore, we have urged, "'Where not required by statute, special interrogatories in aid of a general verdict should be used cautiously and only to clarify rather than to obfuscate the issues involved.' Syllabus Point 16, *Carper v. Kanawha Banking & Trust Co*., 157 W.Va. 477, 207 S.E.2d 897 (1974)." Syl. Pt. 5, *Torrence v. Kusminsky*, 185 W.Va. 734, 408 S.E.2d 684 (1991).

Petitioner's proposed jury instruction was:

Contracts can also be formed between a corporation, like [respondent] and its employee shareholders, like [petitioner], where a corporation has adopted specific bylaws or corporate resolutions. The bylaws and resolutions of a corporation have all the force and effect of a contract as between the corporation and its members and as between the members themselves. In this case, [petitioner] claims that he is entitled to certain "fringe benefits" based upon the terms of his employment agreement and the corporate actions of [respondent]. In order for him to prevail on this claim, [petitioner] has to prove, by a preponderance of the evidence, that his employment agreement provided these benefits or that [respondent] adopted a corporate bylaw or resolution, or both, providing him these benefits.

Petitioner's proposed special interrogatory was:

Has Dr. Ratnani proven by a preponderance of the evidence that he was entitled to the accounts receivable separation benefit based upon his status as a partner/shareholder of [respondent] under the terms of the October 27, 1991 resolution adopted by the partners/shareholders of [respondent]?

As foundation for each of the proposed instructions and the special interrogatory, petitioner argues that respondent made a corporate resolution in 1991, then amended its bylaws in 2003, to ensure that all departing partners would receive a benefit on termination.[3] This

---

[3]Petitioner argues that the resolution was made at the October of 1991 meeting that resulted in the change to the original six shareholders' contracts. Trial testimony established that any discussion at that meeting about the termination benefit was restricted to the six physicians then associated with the practice. In addition, petitioner's testimony conflicts with that of other trial witnesses as to whether the bylaws were amended to extend the termination benefit to any physician associated with the practice, and no documentary evidence supporting that claim was offered.

6

resolution and amendment, he argues, were ancillary documents that were incorporated into petitioner's employment contract by operation of law because of "ambiguous" fringe benefits provisions. In support of his suggestion of ambiguity, petitioner states that the court offered an ambiguity instruction; however, his brief does not divulge the portion he believes to be ambiguous. Indeed, the question in this case is not whether the employment contract was ambiguous, but instead is whether petitioner was entitled to the same contract provision enjoyed by the peers who joined the practice prior to him. In any event, petitioner has offered no West Virginia precedent supporting his proposed instruction or special interrogatory, and we therefore cannot say that the circuit court abused its discretion in refusing to give either.

IV.

We turn to petitioner's third assignment of error, that the circuit court denied his "evidentiary right to cure respondent's inadmissible evidentiary presentation" because he was not permitted to inquire about another physician's receipt of the benefit on termination. With few exceptions, this Court reviews evidentiary rulings made by a trial court for an abuse of discretion:

> The West Virginia Rules of Evidence and the West Virginia Rules of Civil Procedure allocate significant discretion to the trial court in making evidentiary and procedural rulings. Thus, rulings on the admissibility of evidence . . . are committed to the discretion of the trial court. Absent a few exceptions, this Court will review evidentiary and procedural rulings of the circuit court under an abuse of discretion standard.

Syl. Pt. 1, *McDougal v. McCammon*, 193 W.Va. 229, 455 S.E.2d 788 (1995). We have previously held that "[t]he action of a trial court in admitting or excluding evidence in the exercise of its discretion will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion." Syl. Pt. 10, *State v. Huffman*, 141 W.Va. 55, 87 S.E.2d 541 (1955), overruled on other grounds, *State ex rel. R.L. v. Bedell*, 192 W.Va. 435, 452 S.E.2d 893 (1994); *see also* Syl. Pt. 4, *Riggle v. Allied Chem. Corp.*, 180 W.Va. 561, 378 S.E.2d 282 (1989). We are hindered in our analysis of petitioner's argument because petitioner has not pinpointed his objection to a ruling by the court on this issue.[4] Petitioner offers two pages of transcript in which he suggests that the court "prohibited" his evidence and his proposed impeachment evidence. In neither page do we find a timely proffer, a clear prohibition, or an

---

[4]Rule 10(c)(7) of the West Virginia Rules of Appellate Procedure requires that arguments "contain appropriate and specific citations to the record on appeal, including citations that pinpoint when and how the issues in the assignments of error were presented to the lower tribunal. The Court may disregard errors that are not adequately supported by specific references to the record on appeal." Moreover, it is a petitioner's burden to show the error in judgment of which he complains. *See* Syl. Pt. 2, *WV Dept. of Health & Hum. Res. Emp. Fed. Credit Union v. Tennant*, 215 W.Va. 387, 599 S.E.2d 810 (2004).

objection.[5] The discussion about the evidentiary transgression then continues for several transcript pages after the asserted exclusion, as summarized below.

The genesis of this dispute is respondent's motion *in limine*, granted by the circuit court, to exclude evidence related to respondent's confidential settlement agreement with one of its physicians, Dr. Kourosh Ghalili, in 2006.[6] Dr. Ghalili was a similarly-recruited physician in respondent's practice and a former shareholder. He resigned his position in 2004, and, though his employment contract did not have a benefit-on-termination provision, he requested such a payment upon departure.

At trial, respondent's counsel elicited testimony from Dr. Jamal Khan that Dr. Ghalili's contract did not contain the provision. Petitioner's counsel then sought to introduce evidence of the settlement agreement, arguing that respondent opened the door to testimony about the agreement by suggesting, through Dr. Khan's testimony, that only physicians whose contracts contained benefit-on-termination provisions received accounts receivable payments upon departure. Petitioner refers to the following comments made by the circuit court judge to support his assertion that "the [c]ircuit [c]ourt refused to permit any evidence related to [r]espondent's termination benefit payment to Dr. Ghalili":

> Here is what I had been thinking, without acknowledging, and I—of course, Mr. Schulz says to the contrary. It is that in litigation and the issue surrounding that, are limited, but as I was hearing all this evolve, you all might not have been able to work through this without causing some of the prejudice that I was worried would happen. But I'm not ready to say that you get to go where you want to go or, if you do, how it can be accomplished. I'm not going to allow the litigation to come in. I mean, or that he "received it" because it was a result of litigation, because we do not know that. Even if I allow some leeway, and the reason I allowed him a lot of leeway, by the way; is—is you led, he led; is that he gets to cross-examine in direct, so that's why I was allowing those. But it's 12:00. If I say no, you're going to object. And I don't know if I would be right at the moment. I

---

[5]Petitioner asserts that he proffered

on what the testimony would have been had we been permitted to testify beyond the Ghalili dispute about the Ghalili litigation. Just so the record's clear, we anticipate that the testimony would have shown that Dr. Ghalili made a similar claim for accounts receivable benefit as Dr. Ratnani, that he filed a lawsuit, and in the course of that lawsuit the case was settled, that as part of the settlement and accounts receivable benefit was taken into consideration.

This proffer was made on the fifth day of trial, after the conclusion of the presentation of evidence. The evidentiary dispute that is the subject of this assignment of error occurred on the second day of trial.

[6]Petitioner's counsel represented to the court that the termination benefit was calculated and paid as part of this settlement agreement.

need for you to be able to let me go and or go somewhere well, we're not going to the jury room, well, go somewhere and I need to think through this. . . .

Based on the above, it appears that the court declined to allow any evidence of the Ghalili litigation itself, but had not foreclosed the possibility of other curative evidence. After further discussion, the court said,

I think we could reserve the right, right now, and it's a perfect time to do it without anybody thinking there's anything wrong, to recall him, continue this, however you all want to handle it. *I'm not going to rule right now*, because, guess what? You'd be taking a break right now, anyway, other than the little direct you would want.

(Emphasis supplied.) In response, petitioner's counsel proposed to inquire on the issue of whether Dr. Ghalili's benefit-on-termination payment was in dispute.

Respondent objected to the line of questioning about Dr. Khan's knowledge of Dr. Ghalili's request for the benefit-on-termination payment, because Dr. Khan left the practice before Dr. Ghalili did, and his knowledge of the dispute came only to the extent that he was aware of Dr. Ghalili's lawsuit. After repeated questioning from petitioner's counsel about Dr. Khan's knowledge of Dr. Ghalili's request for the benefit—with Dr. Khan responding that he was not with the practice and had no knowledge of the circumstances—the following exchange occurred with Dr. Khan, drawing objection from respondent's counsel:

Q:     I'm not—I'm not concerned about whether you were still with [respondent] when Dr. Ghalili left. What I want to know is, were you aware when Dr. Ghalili left that he claimed an entitlement to an accounts receivable benefit on separation of employment.

A:     Listen, I just heard that he had sued the company, and I—[7]

The court immediately gave the jurors a break. Ultimately, the court told counsel:

[W]hen we get into the litigation and the result of it, it has already been said on and off the record, in previous conferences we've had, this [c]ourt believes the outcome of that litigation, whatever it was, could have been for numerous reasons – I do not want the [j]ury to be given or led to believe that the outcome, whatever that was, was because one was right and one was wrong, or he was right. But I do agree with you that the defendant can't just take the good and leave the bad behind. I mean, you just hear these words "stockholder, physician,

---

[7]Petitioner correctly asserts in his brief that the court characterized this testimony as marred by "some prejudice." In quoting the circuit court judge, petitioner omits the portion of the court's statement wherein it said, "I think that, clearly, [Dr. Khan] was pushed, pressed, and it's not his job to figure out what he can say and not say to the extent that he would be disingenuous."

9

employee," and I have a lot of questions I have for you all in terms of clarification I want to seek and we can get that off the record, that I think the inference that I was concerned about was that everybody else felt that, you know, they were under the same rules that supposedly he said that Dr. Ratnani was. And I think those are still fair, fair areas to question. But how we craft that without going over the line, you came up as close as you could and then look what happened, you know. Well, so I don't know how we're going to deal with that. What's your suggestion?

In response to the circuit court's question, petitioner's counsel said, "Just that we put him on after lunch. I ask a few questions in another subject, instead of him just not showing up, or the [c]ourt instructing him that he's been released or something. I think I have to finish with him." After the lunch break, petitioner's counsel completed the questioning of Dr. Jamal Khan without inquiring further about the dispute with Dr. Ghalili.

At the close of the passage quoted above, the court invited counsel to offer a suggestion, which he did. It is not clear that counsel requested specific relief from the court. Even here, petitioner argues only that he was "denied his evidentiary right to cure . . . inadmissible evidentiary presentation." He states that the court refused to allow him to offer any evidence of Dr. Ghalili's receipt of a benefit-on-termination payment. Though the circuit court was steadfast in its determination that evidence of prior litigation not be presented, it gave petitioner's counsel numerous opportunities to present evidence that did not implicate that litigation, even allowing counsel to question Dr. Khan about his knowledge of Dr. Ghalili's demand. When that line of questioning drew an objectionable response, the circuit court again asked petitioner's counsel, "What's your suggestion?" He then proposed only the further questioning of Dr. Khan. Inasmuch as petitioner broadly argues here that he was denied a "right to cure" the introduction of evidence, we find that the circuit court, in fact, offered him numerous opportunities to make a specific request.

Furthermore, we note that respondent argues that Dr. Ghalili's settlement agreement—signed by petitioner as well as respondent's other physicians, because he was a shareholder of the practice at the time that it was executed—expressly states that it "does not constitute, and shall not be argued or asserted to constitute, any admission or evidence of liability. . . ." Thus, it appears only that Dr. Ghalili was paid a monetary sum in settlement, and not that the sum was made pursuant to the benefit-on-termination provision. We cannot say that the circuit court abused its discretion in ruling on this matter.

V.

Petitioner's final assignment of error is that the circuit court erred in failing to declare a mistrial after evidence was elicited contrary to the court's ruling on another motion *in limine*. "Mistrials in civil cases are generally regarded as the most drastic remedy and should be reserved for the most grievous error where prejudice cannot otherwise be removed." *Pasquale v. Ohio Power Co.*, 187 W.Va. 292, 296, 418 S.E.2d 738, 742 (1992). We held in Syllabus Point 9 of *Board of Education of McDowell County v. Zando, Martin & Milstead, Inc.*, 182 W.Va. 597, 390 S.E.2d 796 (1990):

"'Whether a motion for a mistrial should be sustained or overruled is a matter which rests within the trial court's discretion and the action of the trial court in ruling on such a motion will not be cause for reversal on appeal unless it clearly appears that such discretion has been abused.' Syllabus Point 4, *Moore, Kelly & Reddish, Inc. v. Shannondale, Inc.*, 152 W.Va. 549, 165 S.E.2d 113 (1968)."

Respondent had filed a motion *in limine* asking the court to exclude evidence of the reasons for the termination of petitioner's employment agreement, and the court granted this motion. But during respondent's examination of Dr. Zafrullah Khan, the following exchange occurred:

> Q: And at this meeting . . . [petitioner] was asking for the similar consideration [as another doctor]; is that right?
>
> A: That's correct.
>
> Q: Did [petitioner] meet with you to discuss any of your concerns?
>
> A: After this meeting—after—
>
> Q: Yes, sir.
>
> A: Yes, he met me once in the hospital, and he said that he regrets what he said. He said he didn't mean it, and certainly said I embezzled money and et cetera, the other members of [respondent], and he said he didn't mean it, and to me that was not enough. When I insult somebody in front of all of them then I privately tell you that I regret, I didn't mean it. This is not an apology in my books.
>
> Q: So you just testified that [petitioner] accused you of embezzling from [respondent]?
>
> A: Yes.[8]

Petitioner's counsel objected on the ground that the questioning and testimony violated respondent's own motion *in limine* and petitioner had not prepared to address it. The court attempted to resolve this issue by warning the jury, in the middle of Dr. Khan's testimony, at petitioner's request:

> All right. What I'll do, out of an abundance of caution, is to read to the

---

[8]The court rephrased counsel's question, out of the presence of the jury, "And so you took the contract from him and terminated him because he accused you of embezzlement. That's—" Respondent's counsel interjected, "No, I did not say that."

jury a stipulation that has been entered and agreed to by the parties. And I earlier indicated when we first began this trial that there may be times where you all will be directed to disregard something during the course of the trial. "And so the parties had stipulated and agreed that [respondent] terminated [petitioner's] employment without cause. The motivations of the shareholders of [respondent] in voting for or against terminating the employment agreement are not relevant to [petitioner's] claims . . . Therefore you are instructed to disregard any such testimony and not consider it in your deliberations.

We believe that the error, if any, was sufficiently cured by the trial court's cautionary instruction, offered close in time to the offense, and the circuit court did not abuse its discretion in eschewing the drastic, disfavored declaration of a mistrial. "'Ordinarily where objections to questions or evidence by a party are sustained by the trial court during the trial and the jury instructed not to consider such matter, it will not constitute reversible error." Syl. pt. 18, St*ate v. Hamric*, 151 W.Va. 1, 151 S.E.2d 252 (1966).' Syl. pt. 3, *State v. Lusk*, 177 W.Va. 517, 354 S.E.2d 613 (1987)." Syllabus Point 2, *State v. Ayers*, 179 W.Va. 365, 369 S.E.2d 22 (1988).

Moreover, we note that petitioner did not request a mistrial, but instead requested that the court give an instruction, which it did. This Court has stated, "[A] party will not be permitted to remain silent hoping for a satisfactory verdict from the jury, and then complain when he is disappointed therein." *Legg v. Jones*, 126 W.Va. 757, 765, 30 S.E.2d 76, 80 (1944). Similarly:

> We disfavor the technique of not first making a timely objection to the error and instead waiting until a later time to move for a mistrial. Mistrials in civil cases are generally regarded as the "most drastic remedy and should be reserved for the most grievous error where prejudice cannot otherwise be removed."

*Pasquale v. Ohio Power Co.*, 187 W.Va. 292, 309, 418 S.E.2d 738, 755 (1992) (internal citation omitted). Under these circumstances, a mistrial is unwarranted.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** November 22, 2013

**CONCURRED IN BY:**

Chief Justice Brent D. Benjamin
Justice Robin Jean Davis
Justice Margaret L. Workman
Justice Menis E. Ketchum
Justice Allen H. Loughry II